**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **KHEO KANJANABOUT** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 3:06cv0462** |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | **Judge Thomas A. Wiseman, Jr.** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Plaintiff Kheo Kanjanabout filed this civil action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Defendant" or "Commissioner") denying Plaintiff's claim for Supplemental Security Insurance ("SSI"), as provided under Title XVI of the Social Security Act ("the Act"), as amended. Currently pending is Plaintiff's "Motion for Summary Judgment" (Doc. No. 11), which the Court will construe as a motion for judgment on the administrative record. Defendant has filed a Response (Doc. No. 18), arguing that the Commissioner's decision is supported by substantial evidence and should be affirmed; Plaintiff has filed a Reply Brief (Doc. No. 19).

For the reasons stated below, Plaintiff's Motion will be denied and the decision of the Commissioner affirmed.

**I.     INTRODUCTION**

Plaintiff filed her application for SSI on July 19, 2002, alleging that she had been disabled since September 15, 2001 due to carpal tunnel syndrome in both of her hands and migraine headaches. (*See, e.g.*, Doc. No. 9, Administrative Record ("AR"), at 59–61,63–72.) Plaintiff's application was denied both initially and upon reconsideration. (AR 40–41, 42–43.) Plaintiff subsequently requested and received a hearing. (AR 51, 34–37.) Plaintiff's hearing was conducted on May 13, 2003, by Administrative Law Judge ("ALJ") John D. Henson. (AR 342.) On September 9, 2003, the ALJ issued a decision unfavorable to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act and

_____

[1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of the Social Security Administration. Fed. R. Civ. P. 25(d)(1).

Regulations. (AR 237–51.) On October 3, 2003, Plaintiff filed a timely request for review of the hearing decision. (AR 255–58.) On June 10, 2004, the Appeals Council issued a letter remanding the case to another administrative law judge because the initial hearing decision did not include an adequate evaluation of the opinion evidence of record or a clear statement of the claimant's residual functional capacity. (AR 252–54.)

Plaintiff's second hearing was conducted on November 29, 2004, by ALJ Robert C. Haynes. (AR 349–50.) Plaintiff and Vocational Expert ("VE") Rebecca Williams appeared and testified. On May 3, 2005, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. (AR 17–25.)

On June 22, 2005, Plaintiff filed a request for review of the hearing decision. (AR 15.) On April 8, 2006, the Appeals Council issued a letter declining to review the case (AR 9–11), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was subsequently filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). This Court must affirm if it finds that the Commissioner's decision is supported by substantial evidence in the record and that the Commissioner did not commit any legal errors in the process of reaching that decision. *Id.*; *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).

## II.    REVIEW OF THE RECORD

### A.    Medical Evidence – Physical Health Records

Plaintiff alleges disability due to carpal tunnel syndrome and migraine headaches. (AR 59–61, 63–72.)

Plaintiff first visited the Primary Care and Pain Relief Center ("PCPRC") on February 24, 1999 to obtain a pregnancy test (which was positive) and complaining of headaches and congestion. Dr. Winston Griner referred Plaintiff to the OB/GYN clinic at Vanderbilt and advised her to take Tylenol for her headache.[2] (AR 221.) The Nashville Clinic issued Plaintiff a Certificate to Return to Work/School on this

---

[2] This document does not mention the name of a physician or the hospital where Plaintiff was treated, but is listed in the table of exhibits as from Winston Griner, M.D. at the PCPRC during the period from February 4, 1999 through April 4, 2003. All records from this section are assumed to be from the PCPRC. Dr. Griner was Plaintiff's primary physician at that clinic up until November 2002, when she began seeing Dr. Avis Walters at the PCPRC, as noted below. The signature of the practitioner seeing

date, stating that Plaintiff could return to work on February 25, 1999. (AR 111.) There are no other records from the Nashville Clinic and it is not clear why Plaintiff sought treatment there that day.

Plaintiff apparently first complained of hand pain, numbness and tingling in July 1999, alleging that it had begun with her pregnancy. (AR 112, 220.) She complained of difficulty holding objects and reported she had been dropping things. Wrist splints were recommended and she was referred to a neurologist for EMG tests. (AR 220.) She did not actually see a neurologist until October 5, 1999 (after continuing to complain of increased pain in her hands and wrists). Nerve conduction studies of Plaintiff's hands and arms, performed by Dr. Steven D. Graham at Centennial Medical Center, revealed "electrical evidence of mild prolongation of the distal sensory latencies of both right and left median nerves at the level of the wrist, which is seen in a mild grade of bilateral carpal tunnel syndrome." (AR 114–15.)

Plaintiff apparently first complained of back pain to a practitioner at the PCPRC on September 16, 1999, four days after giving birth. She was diagnosed with postpartum back pain at the site of her epidural and was prescribed Naprosyn, Elavil, and Percocet. An x–ray of her lumbar spine was recommended. (AR 219.)

Plaintiff had follow-up appointments on January 7, April 23, and August 1, 2000 at the PCPRC. At each of these, she continued to complain of low back pain. In January, she was sent to physical therapy and advised to exercise and lose weight. (AR 217.) At the April visit, she began complaining of pain in her right arm as well as bilateral shoulder pain and stiffness. (AR 216.) In August she noted pain in the left shoulder and arm upon reaching. At that visit she had full range of motion in her right shoulder but limited range in the left shoulder with crepitus. This was diagnosed as cervical pain with left radiculopathy (AR 215.) She was first prescribed Percocet, then Lortab and Celebrex, then Soma in addition to the Lortab. (AR 215–17.) Her treatment plan on the note for that visit is largely illegible, but it appears to include reference to an EMG and NST.[3] (AR 215.)

Plaintiff underwent an MRI of her cervical spine on August 9, 2000, the results of which were normal except for a "minimal generalized annular bulge without neural impingement" at C5-6. (AR 137.) A study of her left shoulder conducted the same day was negative. (AR 139.)

Plaintiff on any given visit is usually illegible, but it appears Plaintiff was most frequently seen by one of the nurse practitioners at the clinic, primarily Debra Kleven.

[3] NST appears to be a form of treatment for chronic back pain.

On August 14, 2000, Plaintiff returned to the PCPRC continuing to complain about low back pain. She reported her pain level as 8/10 without medication and 4/10 with medication. The medical practitioner noted the recent MRI showing a bulging disc at C5-6 without impingement, diagnosed cervical pain with radiculopathy, and recommended trigger point injections ("TPI") and physical therapy. (AR 214.) At a follow-up examination on September 11, 2000, Plaintiff continued to complain of low back pain ("LBC") and cervical pain ("C/P"). The treatment plan included scheduling another EMG as well as NST. There is also a reference to another "MRI C-spine." Plaintiff was prescribed Celebrex. (AR 213.)

On September 12, 2000, Plaintiff underwent a "Neuro-Selective CPT" (nerve conduction) test of the median and ulnar nerves of both hands, which indicated no abnormal measures on the left, but "very mild hypoesthetic condition" of the right lunar nerve and "very mild sensory dysfunction" of the palmar branch of median nerve on the right hand. (AR 132–33.) Plaintiff also underwent nerve conduction studies of the lower extremities, the results of which were normal. (AR 134–35.) Plaintiff had a follow-up exam at PCPRC on September 13, 2000 to obtain the results of the nerve conduction studies, but the treatment note from that day is completely illegible. (AR 212.)

Plaintiff's treatment notes at the PCPRC do not indicate that she complained about hand or wrist pain for the next several months, though she continued to report neck and back pain at follow-up appointments on October 11, November 13 and December 13, 2000, and January 12 and February 9, 2001. She rated the pain as "constant and sharp" in October, at which time she received four trigger point injections (AR 211). She was prescribed, at various times, Soma, Lortab, Robaxin, Klonapin, Naprosyn, Celebrex and Vioxx. (AR 207–11.) She repeatedly indicated that medication helped the pain levels. (AR 208, 209.)[4]

On June 21, 2001, Plaintiff returned to the PCPRC for a follow-up examination, complaining of wrist pain, diagnosed as bilateral carpal tunnel syndrome ("CTS"), as well as low back pain. (AR 205.) In July 23, 2001, Plaintiff returned for a follow-up examination for CTS and back and neck pain. She left a phone message the next day stating the medication prescribed for headaches was not working. (AR

---

[4] Most of these records are largely illegible. On December 13, 2000, January 12 and February 9, 2001, she was diagnosed with something that looks like the word "Herbal" but likely says "Headache" (AR 207, 208, 209); that guess is supported by what appears to be a prescription for Imitrex in February (AR 207.)

203.)

She had follow up exam for low back pain, cervical pain and carpal tunnel syndrome on August 16, at which time she also complained of insomnia as well as tenderness and limited range of motion in her both shoulders. (AR 202.) Much of the treatment note that day is illegible, but on August 22, 2001 Dr. Griner put a note in Plaintiff's file indicating a diagnosis of right rotator cuff syndrome with adhesive capsulitis, right carpal tunnel syndrome with right lateral epicondylitis (*i.e.*, tennis elbow), and cervical neck pain with left radiculopathy. Dr. Griner suggested treatment with "ultrasound and a high frequency galvanic stimulation, if appropriate," along with range of motion and strengthening exercises. (AR 204.)

The treatment note for a follow-up exam on September 12 is likewise largely illegible (AR 201), but appears to state that Plaintiff was "not wearing . . . splints when she washes clothes"; "HA [headache] daily 5 yrs"; "palpable frontal sinus pain (photosensitivity)"; "blurred vision"; and "HA [secondary to] eye strain." (AR 201.) The treatment plan suggests another x-ray of the C-spine and an orthopedic evaluation of her right shoulder, elbow and wrist; an eye exam; an attempt to discontinue Imitrex (which the doctor refused to increase); use of nosespray and sunglasses; avoiding caffeine, chocolate, salt, aged meats, cheeses, sorbital, alcohol; wearing the wrist splints; and losing weight. Another note indicates that "carrying small children" appears to aggravate her symptoms. (AR 201.)

On September 14, 2001, Plaintiff returned to HealthSouth for x-rays of her cervical spine, right shoulder and right wrist, all of which were all normal. (AR 127–30.)

The treatment notes for follow-up exams at the PCPRC on October 25, November 27, and December 27, 2001, and January 28 and March 5, 2002 are largely illegible but indicate Plaintiff continued to complain about cervical pain, low-back pain and bilateral carpal tunnel syndrome, and to receive prescription refills.[5] (AR 192–98.) Another EMG of her right upper extremity was recommended on March 5, 2002. (AR 192.)

As a result, Plaintiff underwent further testing on March 27, 2002 with neurologist Dr. W. Garrison Strickland. (AR 116–19.) Dr. Strickland reported that motor conduction studies, sensory conduction studies, and electromyography revealed evidence of "severe right and mild left median nerve entrapment

---

[5] She also came in for Depo-Provera shots on September 20 and December 17, 2001.

at the wrists, consistent with bilateral carpal tunnel syndrome." (AR 117.) He also stated, however, that there was no evidence of generalized peripheral neuropathy or denervation . (*Id.*)

On April 25 and May 28, 2002, Plaintiff returned to the PCPRC for follow-up examinations for neck and low back pain and to obtain prescription refills. The diagnoses on these examinations included cervical pain, carpal tunnel syndrome, lower back pain with radiculopathy, and myofascitis. (AR 190–91.) A mammogram and a head CT were ordered. The mammogram conducted on May 22, 2002 was normal. (AR 230.) The head CT scan conducted the same day was also normal, though it did show "near complete opacification" of the left maxillary antrum suggesting significant inflammation. Other sinus cavities were clear. (AR 229.)

At a follow-up exam on July 2, 2002, Plaintiff continued to complain of low back pain and pain in both hands, as well as right arm pain exacerbated by lifting. She complained of increased pain ("13/10" without medication; 8/10 with medication). She was again diagnosed with lower back pain with radiculopathy, arm/elbow pain, CTS and myofascitis. Her prescriptions were refilled and x-rays of her right elbow and right proximal radius were ordered. (AR 189.) X-rays conducted on July 8 and 15, 2002 were unremarkable. (AR 123–24.)[6] Subsequent MRIs of her right elbow and shoulder, conducted on August 2, 2002, showed no gross abnormalities, but indicated "lateral epicondylitis and/or partial tearing, common extensor tendon origin" at her right elbow (AR 121) and "subacromial-subdeltoid bursitis" and "partial tearing or degeneration, supraspinatus tendon distally" at the right shoulder (AR 122).

On July 30, August 30, October 2, November 6, and December 6, 2002, Plaintiff went back to the PCPRC for follow-up examinations and prescription refills. She continued to complain about low-back and bilateral hand pain, as well as migraines. (AR 183–88.) She apparently saw Dr. Avis Walters at the PCPRC for the first time on November 6, 2002. Dr. Walters prescribed a TENS unit on that date, recommended an MRI of her back, and discontinued Depo-Provera as well as another medication that is not legible. (AR 185.) On December 6, Dr. Walters noted that Plaintiff presented for follow-up for persistent back pain of 10 years following a motor vehicle accident. (AR 183.) Dr. Walters found that Plaintiff had positive straight-leg raise tests, decreased grip strength, tender paravertebral spine, and severe muscle spasms in her back. She diagnosed low back pain with "worsening radiculopathy," severe

---

[6] A drug abuse screening test performed about the same time was negative. (AR 226.)

muscle spasms, obesity, carpal tunnel syndrome, and myofascial pain in her thoracic spine.  She again recommended a back MRI, continued use of the wrist braces, physical therapy and the TENS unit, and ordered a complete urinalysis, the result of which were unremarkable.[7]  (AR 183.)

Also on December 6, 2002, physical therapist Rick Arnold completed a Physical Therapy Patient Assessment on which he indicated Plaintiff's perceived level of functional impairment to be a six out of ten, while Plaintiff herself described her level of pain as a ten out of ten presently and at worst, and eight out of ten at best.  Arnold noted that Plaintiff's pain from her carpal tunnel was at three out of ten.  (AR 171.)  He also assessed her as having a "good" potential for reaching rehabilitative goals.  (AR 172.)

On December 12, 2002, despite having actually seen or treated Plaintiff only two or three times by then, Dr. Walters completed a "Medical Source Statement to Do Work-Related Activities (Physical)" form regarding Plaintiff.  (AR 176–78.)  Dr. Walters indicated that Plaintiff was limited by her impairments to lifting from five to ten pounds either occasionally or frequently.  She supported this assessment with the statement that Plaintiff "experiences severe muscle spasms that incapacitate her while lifting and carrying.  These spasms and 'muscle cramping' occur along the back from shoulder to waist also thoracic chest wall from shoulder into abdominal area.  P[atien]t unable to carry 35 lb toddler, pain so severe brings her to the point of tears."  (AR 176.)  Dr. Walters also opined that Plaintiff should stand or walk for "less than one hour" per day because "she experiences extreme dizziness and nausea when standing for longer than two minutes."  (AR 176.)  Dr. Walters stated that Plaintiff should sit for less than one hour per day because of her "severe muscle cramping and spasms in her back when seated greater than one hour."  (AR 177.)  Dr. Walters also commented that Plaintiff should never climb, crouch, or kneel, and only occasionally stoop or crawl.  Feeling, handling, and reaching were also affected by Plaintiff's impairment because of diminished grip strength as well as numbness in her hands.  Dr. Walters stated that Plaintiff was further limited in her ability to push/pull and see, and should not work near heights, moving machinery, extreme cold temperatures, chemicals, dust, or fumes, the latter because of allergies leading to asthma attacks.  (AR 177.)  Dr. Walters concluded her assessment by stating:

---

[7] On the same day, Dr. Walters also noted that Plaintiff refused trigger point injections.  (AR 183.) A month later she indicated the reason Plaintiff refused trigger point injections was because they exacerbated her muscle spasms.  (AR 182.)

> In summary, [Plaintiff] experiences chronic and severe back pain and muscle spasms with evidence of radiculopathy as well as carpal tunnel syndrome (evidenced via electrophysiologic evaluation on 3/27/02).
>
> Further we are following up on progressive back symptoms with an MRI to investigate a probable worsening of degenerative disc disease versus herniated nucleus pulposes [*sic*]. Until these problems can be sorted out and with appropriate follow up with orthopedic consult, the patient is not a candidate for employment as this could put her at risk for permanent disabilities.

(AR 178.) If Plaintiff underwent another MRI subsequent to that date, the results of it are not in the administrative record.

Plaintiff had follow-up appointments for medication refills with Dr. Walters on January 6, February 6, March 7 and April 4, 2003. (AR 179–82.) In January, Plaintiff indicated physical therapy was helping and assessed her pain as 6/10 at that time. Dr. Walters noted decreased right hand grip strength, positive straight leg raise, decreased right knee flexion, and referred Plaintiff for an orthopedic consult. (AR 182.) In February, Plaintiff complained of pain at a 7 or 8 out of 10. Dr. Walters indicated a finding of significant muscle spasm and paraspinal tenderness, but also noted upper extremity strength to be 5/5. (AR 181.) On March 7, in addition to her normal complaints, Plaintiff reported fatigue. A B12 injection was added to her treatment plan. (AR 180.) On April 4, 2003, Plaintiff rated her pain as "worse" at 8/10, and Dr. Walters noted Meharry had had to postpone the orthopedic consult for which Plaintiff was referred in January. (AR 179.) At basically each of these visits, Dr. Walters diagnosed low back pain with worsening radiculopathy, myofascial pain, right arm and shoulder pain secondary to supraspinatus tendon injury and lateral epicondylitis, morbid obesity,[8] and right knee pain.

On May 9, 2003, Plaintiff complained to Dr. Walters of even further increased back pain, at 9/10. Dr. Walters noted Plaintiff to be obese and that she walked with a "slight antalgic gait." (AR 236.) On June 10, 2003, Plaintiff visited the PCPRC complaining of "sharp and constant" pain in her lower back, neck, and shoulders. Plaintiff reported to the nurse practitioner her saw her that day that sitting made her pain worse, while medications and lying on her stomach helped ease the pain. (AR 339.)

Plaintiff continued to complain of low-back and cervical pain on July 11, 2003. She reported that lying down, bending and any repetitive activity increased her pain, while cold showers and medications

---

[8] Plaintiff is approximately 5 feet tall and, according to her medical records, has since the age of 24 weighed between 200 and 230 pounds.

helped. She also reported that she was walking approximately one to two hours around the greenway each day and that she could perform "ADLs." She was counseled to continue walking, start resistance exercises and decrease consumption of soda, sugar and snacks. Plaintiff's medications were refilled and x-rays of her cervical spine and lower back were ordered, but the results of these, if they were conducted, are not in the record. (AR 285.) On August 15 and October 10, Plaintiff reported that walking and standing increased her pain. (AR 283, 281.) An MRI of her cervical spine was again listed on her "treatment plan" but the record does not indicate that Plaintiff underwent any further MRIs. (AR 283.) Plaintiff continued to complain of back pain on November 4, 2003. (AR 332.)

On December 4, 2003, she completed a pain survey for the PCPRC. (AR 329.) She reported neck, mid-back, and lower back pain, which she described as dull, numb, and tingling. She indicated that her pain was made worse by bending and standing and made better by lying down and walking. She rated her pain without treatment and medication as a 10/10 in intensity, and 5/10 with treatment and medication. Plaintiff also reported that she experienced pain was "all the time" and that her medications caused driving problems and sleepiness. Plaintiff listed the various medications she had tried for pain as including Tylenol, Ibuprofen, Celebrex, Oxycontin, Lortab, Vioxx, Robaxin, Baclofen, Soma, Valium, and Zoloft. (AR 329; *see also* AR 325 (listing only some of these but also including Methadone and Lidoderm).) She listed Soma and Valium as helping the pain. (AR 329.)

Plaintiff visited the PCPRC again on January 8, 2004, complaining of headache, and pain in her neck and middle and lower back unchanged from her last visit, but she stated that medication helped control the pain level. She also complained of foot pain and reported she had seen a podiatrist who recommended corrective shoes for flat foot condition. (AR 325–26.) The treating nurse practitioner observed paraspinal tender points, refilled Plaintiff's medications, and replaced her TENS unit. (AR 326.)

On February 20, 2004, Plaintiff returned to the PCPRC after she slipped on a sidewalk and injured her left knee. An x-ray of plaintiff's knee was taken at this time. Plaintiff also reported her pain severity as 3/10 with medication but 10/10 without. (AR 323.)

On March 29, 2004, Plaintiff completed another Pain Management Questionnaire at the PCPRC very similar to that from December 2003 except she indicated her pain problems began in 1999 as a

result of a car wreck.[9]  (AR 321.)  On the list of medications that helped her pain, she included Lortab and Oxycontin in addition to Soma and Valium. (AR 322.)  The treating practitioner that day specifically noted that Plaintiff did not exhibit medication-seeking behavior.  (AR 319.)

Another Pain Management Questionnaire filled out on April 30, 2004 (AR 315–17) was basically identical, except Plaintiff reported her pain intensity level to be 4/10.  (AR 315.)  A physical examination conducted that day noted both Plaintiff's reported lumbar spine and knee problems, but no new abnormalities.  (AR 313–14.)  Plaintiff returned to the PCPRC for physical examinations and also completed pain questionnaires on August 2 and September 2, 2004 (AR 303–12), reporting the same type, location and intensity of pain.  Her medications protocol was changed somewhat beginning in August and September.  In September she reported decreased neck pain but increased back pain, but again stated the medications were helping to control the pain well.  Physical examinations returned similar findings as on prior dates.

B.      Consultative Examinations and DDS Medical Records Reviews

On September 18, 2002, Dr. Nancy Kahn performed a consultative examination of Plaintiff for the Tennessee Disability Determination Services ("DDS").  (AR 161–64.)  Dr. Kahn listed Plaintiff's medications as including Valium, Xanax, Lortab, Lasix, Potassium Chloride, Remeron, and Fioricet.  (AR 162.)  Dr. Khan described Plaintiff in her Summary as an obese 27-year old female with a history of carpal tunnel syndrome and migraines.  On examination, Dr. Khan found Plaintiff to have full range of motion in her neck, shoulders, elbows, wrists, and hands, and grip strength at "5/5 bilaterally."  (AR 162–63.)  The only remarkable findings included a mild decrease in the range of motion of her right hip and spine.  On the basis of her physical examination and a review of the records, she found that Plaintiff should be able to sit, stand or walk six hours in an eight hour day with no lifting restrictions, but that repetitive wrist movements might require bracing to avoid aggravation of her carpal tunnel symptoms.  (AR 163.)

On September 26, 2002, DDS consulting physician Dr. Juliao[10] completed a Physical Residual

---

[9] Plaintiff's medical records from 1999 do not appear to contain a reference to any motor vehicle accident or any other triggering event for back pain except childbirth.  (*See* AR 219.)

Functional Capacity ("RFC") Assessment (AR 165–70) based upon a review of Plaintiff's medical records, in which he opined that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday, but was limited in her upper extremities in pushing, pulling, handling and fingering.  (AR 166, 167.)  Dr. Juliao noted that electrodiagnostic studies on March 27, 2002 confirmed "severe RT and mild left nerve impingement at the wrists consistent with bilateral carpal tunnel syndrome."  (AR 166–67.)  He also noted, however, that Dr. Kahn's examination of Plaintiff was basically normal, with a finding of full range of motion in the upper extremities and 5/5 grip strength bilaterally, and that Plaintiff's migraines were controlled by medication and rest.  (AR 167.)  He also assessed Plaintiff as limited to "occasional" climbing of rope/ladders/scaffolds, and "frequent" climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling.  (AR 167.)

On December 9, 2003, Plaintiff underwent a consultative examination by Dr. Terri L. Walker for the Tennessee DDS.  Dr. Walker observed that Plaintiff walked into the facility without difficulty and admitted to driving herself to the exam unaccompanied.  With respect to Plaintiff's complaints of carpal tunnel syndrome, Dr. Walker noted that, although a Phalens test was positive bilaterally, Tinel's test and Median Nerve Compression test were both negative; Plaintiff's wrists had no swelling, scars, or tenderness and had full range of motion without pain and 5/5 grip strength; no sensory deficits were appreciated, and peripheral pulses were intact.  With respect to Plaintiff's complaints related to back pain, Dr. Walker observed Plaintiff's back to have no obvious physical deformities, soft tissue swelling, ecchymosis or abrasions.  While Plaintiff had diffuse tenderness of the low back centrally and of the paraspinal muscles, she had no palpable spasms and full range of motion without difficulty.  Straight-leg raises bilaterally were negative, both seated and supine, gait was normal, and deep tendon reflexes were within the normal range.  (AR 287.)

On January 8, 2004, DDS physician Robert E. Burr completed a Physical RFC Assessment regarding Plaintiff (AR 288–295), in which Dr. Burr opined, based on Plaintiff's medical records, that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk about six hours in

---

[10] The physician's signature is actually not legible but the ALJ stated in his opinion that the consultant was Dr. Juliao.  (*See* AR 23.)

an eight-hour workday, sit about six hours in an eight-hour workday, and was unlimited in her ability to push and/or pull. The evidence cited in support of Dr. Burr's assessment includes reference to Dr. Walker's findings, including apparently normal gait, 5/5 grip strength, full range of motion, negative leg raise testing and normal deep tendon reflexes. (AR 289.) Dr. Burr found that no limitations were established in the areas of postural, manipulative, visual, communicative, or environmental abilities. (AR 290–94.)

Finally, on August 12, 2004, Dr. Douglas Wilburn, an orthopedic with the Middle Tennessee Bone & Joint Clinic, performed a consultative orthopedic examination for Tennessee DDS. (AR 296–98.) In reporting her medical history to him, Plaintiff stated she had been told her back pain was muscle related. She also stated it woke her up at night but did not bother her during the day. She reported a history of carpal tunnel syndrome, verified by at least two nerve conduction studies; she also told Dr. Wilburn that surgery had been recommended but she had so far declined to have surgery. She reported her current medications as including Lortab, Soma and Valium. (AR 296.) On physical examination, Dr. Wilburn made few objective findings. He noted some limitations in range of motion in Plaintiff's back and neck, and that straight leg raises produced back pain but "no true radicular pain"; she had full range of motion in her hips and "good" range of motion in her knees, ankles and shoulders. She had "a little decreased sensation" in her right hand involving the index and long fingers. (AR 297.) His impression was of cervical, dorsal and lumbar strain which seemed to be muscle related and warranted continued conservative treatment, and carpal tunnel syndrome that might benefit from surgery. He also noted she might benefit from losing weight. (AR 297–98.) He believed she was capable of doing "some light to moderate work duties" avoiding repetitive or stressful use of her hands, lifting limited to 30 or 35 pounds, and no repetitive lifting, bending or twisting. (AR 298.) The "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" form completed by Dr. Wilburn is basically consistent with these findings,[11] and he additionally indicated that Plaintiff should "never" climb, balance, or stoop and should only "occasionally" reach, handle, finger, or feel. (AR 299–302.)

---

[11] Although the Commissioner contends Dr. Wilburn's Medical Source Statement is inconsistent with his written assessment in that the former indicates a 25-pound limitation on lifting and the latter indicates a 30- to 35-pound limitation, this difference obviously results from the fact that the Medical Source Statement provides boxes to check for 25 pounds and 50 pounds, but nothing in between.

### C.    Mental Health Evaluations

On September 7, 2002, Dr. William O'Brien, Psy.D. examined Plaintiff and reported his findings in a Psychological Evaluation.  (AR 141–45.)  He listed Plaintiff's medications as including Diazepam, Alprazolam, Furosemide, Hydrocodone, Augmentin, Butalbital, Potassium CL, and Remeron.  (AR 142.)  Dr. O'Brien reported that Plaintiff's mood and affect were euthymic, her speech was clear, and her thought processes were organized.  He stated that Plaintiff denied hallucinations, delusions, or suicidal or homicidal ideation, that Plaintiff's judgment and insight were "good" and her communication skills "acceptable."   (AR 143.)   Plaintiff reported "depressive type symptoms" and feelings of being overwhelmed; she also reported agoraphobia, panic attacks, crying spells, low energy, sleep disturbance, and poor concentration.  (AR 143.)  Psychological testing revealed Plaintiff's attention, concentration, and abstract thinking to be intact, although she could not recall any of three memory items after ten minutes.  Dr. O'Brien estimated that Plaintiff's intellectual functioning was between the Borderline and Low Average range of functioning.  (AR 144.)  In his functional assessment, Dr. O'Brien reported that Plaintiff did not appear to be "significantly impaired in her ability to sustain concentration and persistence, remember simple instructions, travel independently, make plans independently of others, socially interact in an acceptable manner, maintain basic standards of neatness/cleanliness, work with others in the work force, be aware of normal hazards in the work/household setting, or in her ability to manage her funds."  (AR 144.)

On September 17, 2002, DDS Physician Dr. Victor Bryan completed a Psychiatric Review Technique form regarding Plaintiff.  (AR 147–60.)  Based largely on Dr. O'Brien's evaluation, Dr. Bryan assessed Plaintiff has having an "affective disorder" "not severe," specified as "major depressive disorder, recurrent, mild."  (AR 147, 150.)  Dr. Bryan found that Plaintiff had no restrictions in her ability to conduct "activities of daily living" but indicated she had mild limitations in the ability to maintain social functioning and to maintain concentration, persistence, and pace.  (AR 157.)  Dr. Bryan noted that Plaintiff had no history of mental health treatment, that her "memory, CCP, social interaction, and adaptation" abilities did not appear to be "significantly impaired," and that she lived with and cared for six children independently.  On that basis, Dr. Bryan concluded Plaintiff mental problems were non-severe at that time.  (AR 159.)

### D.    Plaintiff's Testimony

At the hearing, Plaintiff testified her date of birth was November 18, 1974; she was thirty years old on the date of the hearing, and has an eighth grade education. (AR 352.)

Plaintiff acknowledged she had worked very little in her life, but she had worked once for a few days at a greenhouse planting seeds. She had not worked since September 16, 2001. (AR 352–53.)

Plaintiff testified she has carpal tunnel syndrome in both hands. She was wearing splints at the hearing, and stated they had been prescribed two years ago by Dr. Walters. (AR 353.) She also reported pain in her back, neck and arms, for which she also received treatment from Dr. Walters. (AR 354.) She stated her pain was constant, and reported taking Lortab, Soma and Valium every day to help control the pain. (AR 354–55.) She testified that the medication helps "a little bit," but that it makes her sleepy all the time as a result of which she sleeps a lot. She did not disagree with the ALJ's estimation, based on her own testimony, that she sleeps as much as 20 hours a day. (AR 365.)

She testified she has six children, and her sister lives with her and her husband and helps her take care of the children. (AR 357.)

With respect to her hands, Plaintiff asserted that she wears the splints all the time, even to sleep, and only takes them off to bathe or wash her hands. She also stated she drops things constantly, that she is unable to pick up dishes, hold a pen well, tie her shoes, unscrew a jar lid, button buttons, hold a hammer, etc. (AR 359–60.) She could not comb her hair but she could take a shower and feed herself by eating rice with her fingers. (AR 366.) Her sister does the cooking at her house and her son does the cleaning.

Both standing and sitting for long periods of time are difficult, Plaintiff stated, because those actions make her back hurt and standing too long makes her dizzy. (AR 362.) She stated she mostly spends the day lying down and sleeping except to get up to go to the bathroom and for meals. (AR 363, 365.) Plaintiff stated that she does not read much but sometimes reads magazines and letters to pass time when she is awake. (AR 363–64.) She also stated she does not drive because her medications make her dizzy and she has difficulty gripping. (AR 364.)

Plaintiff reported that Dr. Strickland wanted to perform surgery on her hands but that because he did not take Tenn-Care insurance, Plaintiff did not have the surgery.[12]  Dr. Walters was trying to find a surgeon who would accept Tenn-Care.  (AR 361.)

Plaintiff claimed that she had been limited to the degree she indicated for two or three years.  (AR 365.)

### E.      Vocational Testimony

Vocational Expert ("VE") Rebecca Williams also testified at Plaintiff's hearing.  (AR 367–75.)

The VE agreed with the ALJ that Plaintiff had no past relevant work.  In response to a hypothetical situation posed by the ALJ, the VE agreed that a younger person with no relevant work experience and less than a high school education, who had functional impairments and required sleep as much as 20 hours a day as a side effect of medication, would not be able to work.  (AR 367.)  The ALJ posed a second hypothetical, asking the VE to assume a person with the same age, education and vocational background but who had very minimal use of the upper extremities.  The VE stated that such a person, with an eighth-grade education, would not be able to work.  Likewise a person with severe pain would be unable to work.  (AR 367–68.)

The ALJ then asked the VE to assume a person of the same age and with the same education and vocational background, and the limitations described by Dr. Douglas Wilburn.  According to the VE, the work Dr. Wilburn described as within Plaintiff's abilities was basically a limited range of light work as well as a limited range of sedentary work.  (AR 368.)  The VE could not identify any work an individual with those limitations could perform.  (AR 369.)

The VE also considered the RFC completed by Dr. Robert Burr, who assessed Plaintiff as cable of lifting 50 pounds occasionally and 25 pounds frequently, and standing or walking and sitting for six hours each out of eight.  (AR 288–95 (Exhibit 16-F).)  The VE testified that the capabilities described by Dr. Burr covered a full range of medium, light and sedentary work.  (AR 369.)  The ALJ started to ask the VE about Dr. Nancy Kahn's consultative examination (AR 161–64), based upon which Dr. Kahn believed Plaintiff could stand or sit and walk 6 hours each in an 8-hour workday, with no lifting restrictions except that "repetitive wrist movements may require bracing to avoid aggravation of carpal tunnel syndrome."

---

[12] Tenn-care is referred to as "Ten-ten" in the transcript of the hearing.

(AR 163.)  He got side-tracked, however, and asked about the DDS assessment at Exhibit 10-F, where Dr. Juliao described limitations in handling and fingering allowing frequent use bilaterally of the upper extremities and a 50-pound lifting limitation.[13]  There were no postural limitations, except for only "occasional" climbing of ladders, ropes and scaffolds.  According to the VE, there were jobs at the medium level that a person with these limitations could perform, including janitor jobs (of which she stated there are 8,000 in Tennessee), cook's helper (5,000 jobs in Tennessee), machine operators (10,000 in Tennessee).

The VE specified that a person with a limited education who was restricted in both upper extremities to only occasionally gripping, grasping, handling, feeling would not be able to work.  Rather, a person with limited education would need to be able to perform such activities at least frequently.  (AR 371.)

The VE stated she could identify light work that required frequent use of the upper extremities that a person with the other limitations described (eight-grade education, no relevant work experience) could perform, including maid (about 5,000 jobs in Tennessee); private home cleaners and janitors (about 3,500 in Tennessee); construction laborers (900 in Tennessee); machine operator (2,000 in Tennessee); and assembler (1500 in Tennessee).  (AR 371–72.)

Plaintiff's attorney showed the VE the Medical Source Statement completed by Dr. Walters and asked if there was any work in the economy a person with those restrictions could perform.  The testimony at this point is somewhat confusing, but the VE appeared to believe that a person with the restrictions described by Dr. Walters would be limited to light work, except that the person could not do any frequent lifting at all, and, as previously indicated, there are no jobs in the national or regional economy for a person with an eighth-grade education who does not have at least "frequent" use of her upper extremities.  (AR 373.)

-----

[13] In his assessment, Dr. Juliao wrote "frequently, bilaterally" in the spaces allowed for explaining the degree of the limitations established for pushing and pulling with the upper extremities as well as handling and fingering.  (*See* AR 166, 167.)  It is actually not clear whether Dr. Juliao meant to indicate that Plaintiff was "frequently, bilaterally" limited in the use of her upper extremities, or that she was limited to using her upper extremities "frequently, bilaterally."  The ALJ and Commissioner apparently assumed the latter, which is reasonable considering the fairly specialized meaning of "frequently" used in this context.  (*See* AR 23; Doc. No. 18, at 19.)

The ALJ stated at that point that he would take the matter under advisement, but added that he did not note any evidence in the record of psychological limitations that would rule out work. Plaintiff's attorney appeared to agree with that assessment. (AR 374.)

## III.    THE ALJ'S DECISION

On May 3, 2005, the ALJ issued his written opinion in which he made the following specific findings of fact:

1.    The claimant has never engaged in substantial gainful activity.

2.    The claimant has "severe" impairments including mild bilateral carpal tunnel syndrome (worse on the right), myofascial pain syndrome and obesity.

3.    No impairment or combination of them meets or equals the severity requirements of an impairment listed at Appendix One to Subpart P, 20 C.F.R. Part 404.

4.    The subjective allegations of disability are not credible.

5.    The claimant retains the residual functional capacity to perform medium work with frequent handling and fingering and no more than occasional climbing of ladders, ropes, or scaffolds.

6.    The claimant has no past relevant work.

7.    The claimant is a younger individual.

8.    The claimant has a limited education.

9.    If the claimant could perform the full range of medium work, considering age, education, and no work experience, a directed conclusion of "not disabled" would result under Rule 203.25 of Appendix Two to Subpart P, 20 C.F.R. Part 404.

10.    Although she cannot perform the full range of medium work, using the above cited Rule as a framework for decision making, jobs exist in significant numbers in the national economy that could be performed. Examples of such jobs include: janitor, cook helper, machine operator, maid, construction laborer, and assembler.

11.    The claimant has not been under a disability through the date of this decision.

(AR 24–25.)

In reaching his decision, the ALJ specifically considered the record as a whole and noted that numerous citations in Plaintiff's treatment record at the PCPRC indicate that medications were helping control the pain, keeping it in a range of 3 to 5 on a 10-point scale. Plaintiff also had reported at various times that she was able to carry out all activities of daily living and to care for her six children. She had indicated to her medical practitioners that her medications caused drowsiness, but, as the ALJ remarked,

the "day-by-day treatment narratives give no indication that her daily activities were significantly compromised by it." (AR 21–22.) In addition, as of July 11, 2003, she reported walking as much as one to two hours a day. Her doctor instructed her to continue walking and to add resistance exercises to her routine. She also told Dr. Wilburn that her hands did not bother her during the day. On the basis of this evidence, the ALJ concluded that Plaintiff's testimony at the hearing that constant, severe and incapacitating pain precluded any daily activities or physical functioning was contradicted by the weight of the objective medical evidence and therefore not credible. (AR 22.)

The ALJ also observed that very few objective medical findings supported Plaintiff's allegations of disabling pain. EMG testing in October 1999 revealed only mild bilateral carpal tunnel syndrome. While tests in March 2002 showed the carpal tunnel syndrome had advanced somewhat, showing "severe median nerve entrapment" on the right and mild entrapment on the left, there was still no evidence of denervation or peripheral neuropathy. With respect to her back pain and headaches, a cervical spine MRI performed in August 2000 was normal except for a minimal disc bulge at C5-6. Although an MRI in August 2002 showed evidence of bursitis and partial tendon tears in the right shoulder and right elbow, at the consultative exam approximately six weeks later, Dr. Nancy Kahn found Plaintiff to have full range of motion and no residual problems in her shoulders or elbows.

In reviewing Plaintiff's treating physician's assessment of Plaintiff's functional limitations, the ALJ found that Dr. Walter's opinion was "patently unsupported" by Dr. Walter's own treatment notes (including a notation from May 9, 2003 citing only a "slight antalgic gait") as well as the numerous scans and tests referenced above. For that reason, the ALJ chose not to give Dr. Walter's opinion significant weight. (AR 22–23.)

With respect to the consultative physical examination performed by Dr. Douglas Wilburn on August 12, 2004, the ALJ observed that Dr. Wilburn noted a "good" gait, normal reflexes and strength, no evidence or radiculopathy upon straight leg raising, no neurological deficits, and full range of motion in the hips, knees, ankles, neck and shoulders. Basically his only objective finding was slightly reduced sensation in the right hand. Thus, the ALJ concluded that Dr. Wilburn relied primarily on Plaintiff's subjective reports to reach diagnoses of cervical, dorsal and lumbar spinal strain in addition to a history of bilateral carpal tunnel syndrome. The ALJ therefore found that the fairly significant functional limitations

assessed by Dr. Wilburn were "more restrictive than the treatment records would reasonably support" as well as "inconsistent with Dr. Wilburn's own narrative report that essentially only documented some slight loss of sensation in the right hand." (AR 23.) For that reason, the ALJ likewise did not accord Dr. Wilburn's opinion significant weight.

Rather, the ALJ concluded that the "weight of the evidence confirms a history of mild bilateral carpal tunnel syndrome, worse on the right" and "credibly shows intermittent musculoskeletal pain which, absent objective evidence of a significant impairment to the spine or peripheral joints, has been medically attributed to a myofascial pain syndrome." While the ALJ found that these problems, along with significant obesity of long duration, constituted "severe impairments," but that the record did not credibly support a finding of a severe impairment of the spine, shoulders or elbows, or one related to headaches. (AR 23.) Accordingly, the ALJ found that Plaintiff was capable of medium work limited to "frequent" fingering and handling and no more than "occasional" climbing of ladders, ropes or scaffolds.

## IV.    CONCLUSIONS OF LAW

### A.    Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Sec'y of Health & Human Servs*., 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Sec'y of Health & Human Servs*., 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Comm'r of Soc. Sec.,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consol. Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the

decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) (citations omitted).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding the claimant's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of the claimant's condition; and (4) the claimant's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

**B.      Proceedings at the Administrative Level**

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" includes previous work performed by the claimant, as well as any other relevant work that exists in the national economy in significant numbers, regardless of whether such work exists in the immediate area in which the lives, whether a specific job vacancy exists, or whether the claimant would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g.*, *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the claimant, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the claimant must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Heston*, 245 F.3d at 534 (citing *Abbott*, 905 F.2d at 923; 20 C.F.R. §§ 404.1520(b) and 416.920(b)). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)(2000)). Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is

presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled. *Heston*, 245 F3d at 534.

Once the claimant establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts at step five to the Commissioner to show that the claimant can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g.*, *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. 20 C.F.R. §§ 404.1520, 416.920. In cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner may rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining a claimant's residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. 42 U.S.C. § 423(d)(2)(B).

### C.    Plaintiff's Statement Of Errors

Plaintiff here contends that the ALJ erred in according too little weight to treating physician Dr. Avis Walters' December 6, 2002 evaluation of Plaintiff, and to orthopedic specialist Dr. Douglas Wilburn's opinion resulting from his consultative examination of August 12, 2004, both of which, if adopted, would have required a finding of disability.

Sentence four of § 405(g) provides that the district courts "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. §

405(g). "In cases where there is an adequate record, the [Commissioner's] decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994); *Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

### (1)    The Weight Accorded to Treating Physician Dr. Walters' Assessment

Under the applicable regulations, "[m]edical opinions are statements from physicians . . . or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). The Social Security Regulations expressly require the agency to "consider" the medical opinions in the record along with the other relevant evidence. 20 C.F.R. § 416.927(b). Perhaps even more importantly, the regulation requires the agency always to "give good reasons" for not giving controlling weight to a treating physician's medical opinion in the context of a disability determination. 20 C.F.R. § 416.927(d)(2).

As the Sixth Circuit has recognized, a Social Security Ruling further explains that, pursuant to this regulation, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (SSA July 2, 1996), *cited in Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (in the context of considering the application of the identical regulations pertaining to DIB as opposed to SSI). "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that [he] is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures application of the "treating physician rule" and permits meaningful

review of the ALJ's application of that rule. *Wilson*, 378 F.3d at 544–45 (citing *Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004)). As the Sixth Circuit demonstrated in *Wilson*, an ALJ's failure to give "good reasons" is reversible error, regardless of whether the ALJ's decision is otherwise supported by substantial evidence. *Id.* at 546.

The referenced regulations specify several relevant factors for determining the weight to be given a medical source's opinion: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion, *i.e.*, "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist, among other potentially relevant but unspecified considerations. 20 C.F.R. § 416.927(d).

Plaintiff here maintains that the ALJ erred under these regulations in failing to accord Dr. Avis Walters' opinion controlling weight. While it is true that Dr. Walters was Plaintiff's treating physician, she apparently had not treated Plaintiff for an extensive period of time when she issued her Medical Source Statement. In addition, the ALJ noted that Dr. Walters' opinion is not well supported by the objective medical evidence in the record, and is contradicted by other substantial evidence in the record, including several examinations conducted by DDS physicians as well as Dr. Walters' own treatment notes and diagnostic studies of Plaintiff's wrists and back. An ALJ is not required to give controlling weight to a treating physician's evaluation unless it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2). In the presence of such contradictory evidence, the ALJ must weigh the treating physician's opinion against the other evidence in the record and in light of the criteria other listed above. *Id.*

In this case, the ALJ gave good reasons for rejecting Dr. Walters' evaluation, with citations to specific evidence in the record, including DDS examinations and consultations, the objective medical and diagnostic evidence in the record, and Dr. Walters' office's treatment notes, as indicated above. The Court finds that the ALJ applied the appropriate legal standard in assessing Dr. Walters' evaluation. Moreover, while there is certainly sufficient evidence in the record to support a contrary conclusion, the

ALJ's determination that Plaintiff is not functionally impaired to the extent indicated by Dr. Walters is supported by substantial evidence in the record.

### (2)    The Weight Accorded Dr. Wilburn's Opinion

The same regulations pertain to the ALJ's consideration of Dr. Douglas Wilburn's evaluation of Plaintiff's functional abilities.    Namely, because Dr. Wilburn's assessment qualifies as a "[m]edical opinion" from a physician reflecting his judgment "about the nature and severity of [Plaintiff's] impairment(s)," 20 C.F.R. § 416.927(a)(2), the ALJ is required to "consider" that opinion along with the other relevant evidence, 20 C.F.R. § 416.927(b), and to "give good reasons" for not giving weight to it.  20 C.F.R. § 416.927(d)(2).

Dr. Wilburn did not treat Plaintiff over a period of time.  Rather, he saw her once for a consultative examination at the request of the Tennessee DDS.  However, he is an orthopedic "specialist," a factor that could justify according more weight to his opinion than to other medical opinions in the record.  20 C.F.R. § 416.927(d)(5).  The ALJ nonetheless determined that Dr. Wilburn's opinion was not entitled to great weight, and Plaintiff contests that decision.

As with Dr. Walters' evaluation, however, the ALJ gave good reasons for his decision not to accord great weight to Dr. Wilburn's opinion, as set forth above.  He specifically noted that Dr. Wilburn's assessment was not supported by his own objective medical findings and that he was overly reliant on Plaintiff's subjective statements.  Essentially the only objective finding Dr. Wilburn made was of a slight loss of sensation in Plaintiff's right hand.

The Court therefore finds that the ALJ applied the appropriate legal standard and that his decision to accord little weight to Dr. Wilburn's opinion is supported by substantial evidence in the record.

## V.    CONCLUSION

For the reasons discussed above, Plaintiff's Motion for Summary Judgment will be denied and the decision of the Commissioner affirmed.

An appropriate order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge